IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| BRENDA KAYE SEAMSTER CARR, | ) | 4:10CV00025 |
| | ) | |
| Claimant, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | By: Jackson L. Kiser |
| | ) | Senior United States District Judge |
| Defendant. | ) | |

Before me is the Report and Recommendation of the Magistrate Judge regarding the cross Motions for Summary Judgment filed by the Commissioner of Social Security and the Claimant, Brenda Carr. Rep. and Recommendation, Mar. 7, 2011, ECF No. 25; Claimant's Mot. for Summ. J., Nov. 19, 2010, ECF No. 14; Def.'s Mot. for Summ. J., Jan. 19, 2011, ECF No. 21. In addition, the Claimant filed a Response to the Commissioner's summary judgment motion. Resp., Feb. 3, 2011, ECF No. 24. The Magistrate Judge rendered his Report and Recommendation on March 7th, 2011. The Claimant timely objected on March 18th, 2011. Objection, Mar. 18, 2011, ECF No. 26. For the reasons explained herein, the Court **OVERRULES** the Claimant's Objection, **ADOPTS** the Magistrate Judge's Report and Recommendation, **GRANTS** the Commissioner's Motion for Summary Judgment, **AFFIRMS** the Commissioner's final decision, and **DISMISSES** this case from the docket.

## FACTS

On June 16th, 2008, the Claimant filed an application for child's insurance benefits, citing hydrocephalus[1] and borderline intellectual functioning, with a disability onset date of January 1st,

---

[1] According to the National Library of Medicine and the National Institutes of Health, hydrocephalus is a condition where the patient has a buildup of fluid inside the skull, which leads to brain swelling. Although this ailment is

1

1972.  R. at 15, Oct. 13, 2010, ECF No. 10.  The Claimant is currently sixty-one years old and has been receiving supplemental security income since 1985, but now seeks benefits going back to 1972, when she was twenty-one years old.  R. at 17.  The Social Security Administration denied her claim both initially, on November 5th, 2008, and upon reconsideration, on April 1st, 2009.  R. 62-66, 71-75.  The Claimant then requested a hearing before an Administrative Law Judge, which was held on August 10th, 2009.  R. at 15, 76-82.  The Claimant was represented by counsel at this administrative proceeding.  R. at 15.

On October 8th, 2009, the ALJ issued a written decision in which he denied the claim for benefits going back to 1972.  The ALJ found that as of January 1st, 1972, the claimed onset date, the Claimant had not yet reached twenty-two years of age, as required to receive child's insurance benefits under 20 C.F.R. § 404.350(a)(5).  R. at 17.  The ALJ further determined that the Claimant had not engaged in any substantial gainful activity since January 1972.  Id.  The ALJ found that the Claimant had two severe impairments prior to age twenty-two, namely arrested hydrocephalus and borderline intellectual functioning.  Id.  Although the ALJ concluded that the Claimant did not have an impairment or combination of impairments that met or equaled a listed impairment prior to age twenty-two, he went on to determine her residual functional capacity and whether jobs existed in the economy which the Claimant could perform.  Id.  The ALJ found that the Claimant retained the residual functional capacity to do sedentary work limited to simple, unskilled jobs.  R. at 19.  Noting that there were jobs in significant numbers in the economy that the Claimant could perform, the ALJ ultimately concluded that the Claimant was not disabled prior to reaching age twenty-two.  R. at 24-25.

---

commonly referred to as "water on the brain," the fluid in the skull is not actually water, it is cerebrospinal fluid. Cerebrospinal fluid, when flowing properly, helps the brain by bringing it nutrients and removing waste. Hydrocephalus occurs when there are problems with cerebrospinal fluid flow and absorption, which, in turn, builds up pressure on the brain.  That pressure damages brain tissues.  PubMed Health, Hydrocephalus, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002538/ (last visited Apr. 28, 2011).

The Claimant appealed this decision to the Social Security Administration's Appeals Council and submitted an additional exhibit to that body. R. at 5, 10. The Appeals Council denied review on May 21st, 2010, at which time the Claimant, now proceeding pro se, initiated this action for court review of the administrative decision. R. at 1-3; Compl., June 7, 2010, ECF No. 3. In his Report and Recommendation, the Magistrate Judge noted that "[t]he record does not contain contemporaneous evidence which establishes that [the Claimant] suffered disabling hydrocephalus prior to age twenty-two." Rep. and Recommendation 3. The Magistrate Judge went on to examine two pieces of retrospective evidence from the Claimant's treating neurosurgeon, Dr. George Hurt, and the Claimant's primary care physician, Dr. Stephen Thompson. Id. at 3-4. The Report and Recommendation highlights the fact that neither doctor had brain images or medical records from the 1970s to back up their retrospective opinions. Id. The Magistrate Judge concluded that substantial evidence supported the ALJ's findings and recommended that this Court grant summary judgment to the Commissioner and affirm the Commissioner's final decision. Id. at 4.

In her Objection, the Claimant insists that she "was proven disabled at childbirth." Objection 2. She points out that her doctors have said that when she was young, she was clumsy and unsteady in her gait. Id. The Claimant also makes the point that medical science did not have the proper equipment to detect her hydrocephalus when she was born in the 1950s, and that she should not be penalized because she was born in a less technologically advanced era. Id. at 2-3. Finally, the Claimant mentions a bevy of other ailments that the ALJ did not consider, including single-eye blindness, high blood pressure, longstanding depression, and complications with childbirth. Id. at 2. She has also attached three documents to her filings that were not in the

administrative record.  Claimant's Mot. for Summ. J. Ex. A 1, 7-8, Nov. 19, 2010, ECF No. 14-1.

## APPLICABLE LAW

In a Social Security appeal, a District Court must not undertake a de novo factual review of the Commissioner's decision.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Instead, the Court must uphold the Commissioner's decision where his factual findings are supported by substantial evidence and he has applied the proper legal standard.  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing references omitted).  Substantial evidence is "more than a scintilla, but less than a preponderance of the evidence."  Id. (citing references omitted).  In other words, "if there is evidence to justify a refusal to enter judgment as a matter of law were the case before a jury, then there is substantial evidence."  Townsend By and Through Townsend v. Chater, No. 94-2292, 1995 WL 406614, at *2 (4th Cir. July 11, 1995) (quoting Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)).

It is the Commissioner's role to evaluate the medical evidence and asses symptoms, signs, and findings to determine the Claimant's functional capacity.  20 C.F.R. §§ 404.1527-404.1545.  See also Kearse v. Massanari, 73 Fed.Appx. 601, 603 (4th Cir. 2003).  The Code of Federal Regulations gives the Commissioner some latitude in resolving factual inconsistencies in the evidence.  20 C.F.R. §§ 404.1527, 416.927; Hays, 907 F.2d at 1456.  Unless the decision lacks substantial evidence to support it, the final determination of whether the Claimant is disabled is left to the ALJ and the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e); Thomas v. Commissioner of Social Sec., No. 4:10-cv-15, 2011 WL 867092, at *2 (W.D.Va. Mar. 11, 2011).  If substantial evidence supports the ALJ's resolution of the conflicts in the evidence, then this Court must affirm the Commissioner's final decision.  Hays, 907 F.2d at 1456

(quoting Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1973)). "In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176. Regardless of whether the Appeals Council denies review, the Fourth Circuit has instructed its District Courts to consider all evidence presented at the administrative level, including new evidence presented to the Appeals Council. Jones v. U.S. Dept. of Health & Human Services, No. 97-1107, 1998 WL 85408, at *1 (4th Cir. Feb. 27, 1998) (Appeals Council denied review); Mullinax v. Secretary, Dept. of Health and Human Services, No. 90-3043, 1991 WL 10052, at *4 (4th Cir. Feb. 4, 1991) (Appeals Council granted review). But see Falge v. Apfel, 150 F.3d 1320, 1323 (11th Cir. 1998) (where the Appeals Council denies review, the reviewing Court only looks to evidence presented to the ALJ to determine whether substantial evidence supports the Commissioner's decision); Cotton v. Sullivan, 2 F.3d 692, 696 (6th Cir. 1993) (the Court cannot reverse the ALJ's decision on the basis of evidence first presented to the Appeals Council). If there is new evidence that was not presented at the administrative level, the Court may remand to the Commissioner for consideration of that new evidence if:

> (1) the evidence [is] relevant to the determination of disability at the time the application was first filed; (2) the evidence [is] material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before her; (3) there [is] good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant…make[s] at least a general showing of the nature of the new evidence to the reviewing court.

Miller v. Barnhart, 64 Fed.Appx. 858, 859-60 (4th Cir. 2003).

There is a five-step sequential process for determining disability. 20 C.F.R. § 404.1520(a)(4). In the first step, the ALJ determines whether the Claimant has engaged in substantial gainful activity during the period of disability. 20 C.F.R. §404.1520(a)(4)(i). If she

has, the inquiry ends and she is not entitled to benefits. 20 C.F.R. § 404.1571. If she has not, step two requires the ALJ to consider whether the Claimant has a medically determinable physical or mental impairment that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). If she does, the ALJ determines at step three whether the Claimant has an impairment or combination of impairments that meets or equals an impairment listed in 20 C.F.R. § 404 subpt. P, app. 1. 20 C.F.R. § 404.1520(a)(4)(iii). If she does meet the listed impairments, then the ALJ must take into account her residual functional capacity and her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the Claimant can still do her past relevant work, then she is not disabled. Id. If she cannot, the ALJ considers her residual functional capacity, age, education, and work experience in an effort to determine whether there would be any work to which the Claimant could adjust. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can adjust to other work, she is not disabled. Id.

## ANALYSIS

I. There Is Substantial Evidence that the Claimant Does Not Meet or Equal Listing 11.17

The ALJ determined that the Claimant in this case did not have an impairment or combination of impairments that met or equaled a listed impairment prior to age twenty-two. R. at 17-18. The ALJ conceded that medical expert Dr. Kenneth Cloninger testified that, given the *current state* of the Claimant's hydrocephalus, she probably *now* meets listing 11.17(A) in 20 C.F.R. § 404 subpt. P, app. 1. The administrative record was simply too scant for the ALJ and the medical expert to determine that the Claimant met the aforementioned listing *prior to her twenty-second birthday*, which is the issue in this case.[2] R. at 18. To meet listing 11.17(A), the

---

[2] The record is replete with medical reports documenting the Claimant's hydrocephalus from the mid-1980s onwards. Retrospective opinions covering the relevant time period, which is 1972 and before, are few and far between. Regardless of whether the evidence is retrospective or contemporaneous, however, the Claimant must present evidence of some type that is relevant to the time period in question. See Johnson v. Astrue, 628 F.3d 991,

6

Claimant would have to demonstrate "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. § 404 subpt. P, app. 1, listing 11.17(A); 20 C.F.R. § 404 subpt. P, app. 1, listing 11.04(B).

Keeping in mind that, at this stage, it is incumbent upon the Claimant to prove that she is disabled, substantial evidence supports the ALJ's conclusion that the Claimant's hydrocephalus did not rise to the level of a listed impairment during the time period in question. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981) ("[a] claimant for disability benefits bears the burden of proving disability"). It should be noted at the outset that there is still some doubt about when, precisely, the Claimant's hydrocephalus developed. In a September 2004 letter, the Claimant's treating neurosurgeon, Dr. Hurt, writes of his "suspicion that [the hydrocephalus] was in fact a congenital problem." R. at 262. The Claimant's primary care doctor during the 1970s, Dr. Thompson, also wrote that in the 1970s the Claimant "had microcephalus and *later developed* hydrocephalus." R. at 801 (emphasis added). In that same November 2008 letter, Dr. Thompson noted that in the 1970s the Claimant was "not able to work because she was clumsy." Id. The ALJ correctly noted that whether the Claimant is unable to work is a legal determination for the Commissioner, not a medical determination for physicians. Morgan v. Barnhart, 142 Fed.Appx. 716, 722 (4th Cir. 2005); R. at 24.

---

995-96 (8th Cir. 2011) (acknowledging that the claimant's condition may worsen and result in disability, but affirming the ALJ's decision that during the relevant time period the claimant was not disabled); Mason v. Astrue, No. cv209-85, 2010 WL 2636089, at *5 (S.D.Ga. June 3, 2010) (ALJ properly discounted a physician's opinion because that opinion did not cover the relevant time period); Downs v. Astrue, No. 2:07-cv-234, 2009 WL 742733, at *4 (N.D.Miss. Mar. 17, 2009) (noting that despite the voluminous record, there was no objective evidence that the ailments complained of were present during the relevant time period). See also Manning v. Bowen, 717 F.Supp. 429, 432 (W.D.Va. 1989) (the ALJ must consider retrospective, as well as contemporaneous, evidence) (Kiser, J.).

In June 2008, Dr. Hurt commented that the Claimant's hydrocephalus "has apparently caused some problems with overall coordination." R. at 174. Dr. Hurt attached no concrete time period to this observation. Dr. Robert Elliott, a general internist, deferred to Dr. Hurt on the Claimant's hydrocephalus issues in a July 2008 letter. R. at 176. A November 2008 record from University of Virginia Hospital reflects the Claimant's self-reported gait issues dating back to the 1980s, which is a decade after the time period at issue. R. at 353. Closer in time is an August 1984 medical report from Lynchburg General Hospital noting that the Claimant's husband reported that she had been awkward in her gait since 1977. R. at 667.

The Commissioner has some latitude in resolving inconsistencies in the evidence. 20 C.F.R. §§ 404.1527, 416.927; Hays, 907 F.2d at 1456. Not only is 1977 still five years beyond the latest date in question, but the aforementioned report from Lynchburg General Hospital shows that the attending physician, Dr. Thomas Dobyns, concluded that the Claimant had "5/5" motor functioning in all groups. R. at 668. Although Dr. Dobyns commented that the Claimant drifted a bit and had "some sluggish return to neutral position," he noted that tandem gait was normal. Id. In a 1985 University of Virginia Medical Center record, attending physician Dr. John Jane reported that the Claimant had "occasional unsteady gait." R. at 196. A December 1973 University of Virginia Hospital emergency room report notes only "NT" for "gait/station."[3] R. at 492. Some sluggishness or occasional unsteady gait, of course, does not rise to the level of "sustained disturbance" contemplated by the Code of Federal Regulations. 20 C.F.R. § 404 subpt. P, app. 1, listing 11.17(A); 20 C.F.R. § 404 subpt. P, app. 1, listing 11.04(B). Furthermore, Dr. Hurt and another attending neurosurgeon have noted that the Claimant is "asymptomatic from this hydrocephalus" and that "there is nothing to suggest that this is acute

---

[3] "NT" likely means either "not tested" or "within normal limits."

8

hydrocephalus." R. at 518, 794. Perhaps most damaging to the argument that the Claimant meets listing 11.17(A) is her admission that "I used to go dancing." R. at 127.

II. Substantial Evidence Supports the Conclusion that the Claimant Cannot Meet or Equal Listing 12.02

The ALJ next evaluated whether the Claimant, prior to age twenty-two, could meet or equal listings 12.02 and/or 12.05. 20 C.F.R. § 404 subpt. P, app. 1, listing 12.02 (organic mental disorders); 20 C.F.R. § 404 subpt. P, app. 1, listing 12.05 (mental retardation). While substantial evidence supports the ALJ's position that she could not meet listing 12.02, substantial evidence does not support his conclusion that the Claimant could not meet listing 12.05. R. at 18-19. There are two ways for the Claimant to meet listing 12.02. Using the first method, she would have to demonstrate "loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one" of a list of seven symptoms. 20 C.F.R. § 404 subpt. P, app. 1, listing 12.02(A). She would also have to show that the above resulted "in at least two of the following: (1) Marked restriction of activities of daily living; or (2) Marked difficulties in maintaining social functioning; or (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration." 20 C.F.R. § 404 subpt. P, app. 1, listing 12.02(B).

Aside from a 1968 Virginia Baptist Hospital report, the record contains no documentation from the time period in question, forcing the Court to rely on retrospective opinions. Manning, 717 F.Supp. at 432 (ALJ must consider retrospective evidence). That 1968 record chronicled the birth of the Claimant's first child through a cesarean section and, in relevant part, noted only that the Claimant was psychologically younger than her actual age. R. at 835. In a November 2008 letter, Dr. Thompson commented that when he was treating the Claimant in the 1970s she "had

significant problems with memory retention and had depression at times." R. at 171. Though not referring to any specific time period, Dr. Hurt noted in June 2008 that the Claimant's hydrocephalus "has apparently caused some problems with overall…mentation." R. at 174.

While the retrospective opinions of Drs. Hurt and Thompson may provide support for the persistence of memory impairment or disturbance of mood, the bulk of the evidence in the record suggests that the Claimant's memory has worsened with time and that she did not have significant memory problems until the 1980s. 20 C.F.R. § 404 subpt. P, app. 1, listing 12.02(A)(2) (memory impairment); 20 C.F.R. § 404 subpt. P, app. 1, listing 12.02(A)(5) (disturbance in mood); R. at 811 (2008 medical report indicating declining memory over time). In a 1985 University of Virginia Hospital record, Dr. Jane reported that the Claimant "correlates her difficulty with memory and confusion beginning with a dog bite in her thigh in 1980." R. at 196. Several medical reports place the Claimant's memory problems just after the onset of her severe headaches in 1984. R. at 203, 207, 261, 515, 667. A few University of Virginia Hospital reports from 1985 indicate that the Claimant was complaining of increased memory loss at that time. R. at 507, 526. Again, the period in question is the time up to and including 1972. All of the aforementioned medical records indicate that the Claimant's issues with memory and mood did not begin until the 1980s.

Even if the Claimant were given the benefit of the doubt on the first half of this listing 12.02 test, she would be unable to meet the second part of the test, demonstrating marked difficulties in two of the enumerated areas. 20 C.F.R. § 404 subpt. P, app. 1, listing 12.02(B). A limitation is "marked" where it "is more than moderate but less than extreme" and "where the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis."

Smith v. Astrue, No. 2:09-cv-38, 2010 WL 4033548, at *8 (W.D.Va. Oct. 15, 2010) (internal citing references and quotation marks omitted). Although there is evidence that the Claimant began having significant difficulties in the activities of daily living starting in late 2007, there is little evidence of trouble during the time before the Claimant's twenty-second birthday. R. at 354 (notable cognitive difficulties since December 2007 have led to missed appointments and trouble cooking). While it is true that the Claimant did not drive, she testified that she was a homemaker in the years after she got married, which was in 1967. R. at 39. The Claimant agreed that in that role she made beds, cooked, and raised the children. Id. The Claimant also noted that she used to help her mother with housework, cooking, and babysitting. R. at 124. Although the Claimant's sister testified that the Claimant really could not make beds, do housework, or cook well, the majority of the evidence discussed above suggests otherwise. R. at 42-43. Given the above evidence, the Claimant's restrictions in daily living could not be characterized as marked. 20 C.F.R. § 404 subpt. P, app. 1, listing 12.02(B)(1).

As to social functioning, it was noted in a 2008 medical report that the Claimant could not engage in conversation about her personal life without getting extremely emotional. R. at 436. This, however, does not bear upon the time period in question. As noted above, the Claimant used to help her mother babysit. R. at 124. She was also married for many years, beginning in 1967. R. at 31, 354. The Claimant further noted that she used to enjoy dancing, which was presumably a social activity. R. at 127. Although there is not much evidence concerning the Claimant's social functioning in the years before she turned twenty-two, what little there is does not suggest marked difficulties. 20 C.F.R. § 404 subpt. P, app. 1, listing 12.02(B)(2).

The evidence on difficulties maintaining concentration, persistence, and pace is more mixed. It was noted during the course of a 2008 neuropsychological exam that the Claimant "frequently demonstrated rigidity and slowed processing speed." R. at 354. That same exam concluded that "her concentration is good." R. at 436. Closer to the period at issue was a 1985 neuropsychological test in which doctors found deficits "in almost all areas assessed including…attention and concentration." R. at 508. The Claimant also testified that during the time period in question she was slower than other people, a point with which her sister agreed. R. at 38, 41. Unfortunately, the evidence discussed above does not make it clear whether or not the Claimant had marked difficulties in concentration, persistence, and pace. Furthermore, there is no indication in the record that the Claimant has ever experienced extended episodes of decompensation. 20 C.F.R. § 404 subpt. P, app. 1, listing 12.02(B)(4). Even giving the Claimant the benefit of the doubt, she is unable to demonstrate marked deficits in two areas as required by 20 C.F.R. § 404 subpt. P, app. 1, listing 12.02(B).

The Claimant also fails to meet or equal listing 12.02 using the second method available to her. That second method required her to demonstrate "[m]edically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psycho-social support" plus fit into one of three enumerated categories of function. 20 C.F.R. § 404 subpt. P, app. 1, listing 12.02(C). Given the Claimant's ability to help her mother with chores and babysitting and serve as a homemaker, discussed above, it is doubtful that the Claimant even meets listing 12.02(C)'s threshold requirements. Assuming for the sake of discussion that she could meet listing 12.02(C)'s preliminary requirements, she does not meet any of the three function categories that follow. The record contains no evidence of

decompensation during or prior to 1972, precluding the Claimant from meeting listing 12.02(C)'s first two categories of function. The record further demonstrates that during the years in question the Claimant had no need for a highly supportive living arrangement. In fact, the record shows that as a young adult the Claimant helped support others. R. at 39 (raised children), 124 (helped her mother babysit).

III. The ALJ's Conclusion that the Claimant Could Not Meet or Equal Listing 12.05 Is Not Supported by Substantial Evidence

Substantial evidence does not support the ALJ's conclusion that the Claimant did not meet or equal 20 C.F.R. § 404 subpt. P, app. 1, listing 12.05, mental retardation. The Code of Federal Regulations sets out four ways that the Claimant could meet listing 12.05. The Claimant is categorically unable to avail herself of one of those four methods because her I.Q. is above fifty-nine. 20 C.F.R. § 404 subpt. P, app. 1, listing 12.05(B) (threshold requirement of I.Q. of fifty-nine or less); R. at 355 (full scale I.Q. of seventy-nine in 2008), 507 (verbal I.Q. of eighty, performance I.Q. of sixty-three in March 1985), 527 (verbal I.Q. of eighty-two in November 1985). Although there is nothing in the record indicating what the Claimant's I.Q. was prior to her twenty-second birthday, the Fourth Circuit considers mental retardation to be "a lifelong condition" and thus "assume[s] that the claimant's IQ ha[s] remained relatively constant." Luckey v. U.S. Dept. of Heath & Human Servs., 890 F.2d 666, 668 (4th Cir. 1989) (for "relatively constant" quote) (citing reference omitted); Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir. 1985) (for "lifelong condition" quote). Although the ALJ's decision notes that "the claimant did not have a valid IQ of 60 through 70," both the Code of Federal Regulations and the case law insist that the ALJ use the Claimant's lowest I.Q. score. 20 C.F.R. § 404 subpt. P, app. 1, listing 12.00(D)(6)(c); Johnson v. Astrue, No. 2:10-cv-22, 2011 WL 902437, at *5 (W.D.Va.

Mar. 15, 2011). As noted above, the record indicates that the Claimant's lowest score was a performance I.Q. of sixty-three in 1985. R. at 507. The Court therefore considers whether substantial evidence supports the ALJ's finding that the Claimant could not meet listing 12.05 using any of the three remaining methods.

The method set out in listing 12.05(D) requires an I.Q. of sixty through seventy which results in at least two of the same four restrictions set out in listing 12.02(B). As noted above in Section II's discussion of whether the Claimant is able to meet or equal listing 12.02(B), she cannot show that she meets two of those four enumerated restrictions. Her inability to demonstrate the marked restrictions required by listing 12.02(B) necessarily precludes her from making the same showing for listing 12.05(D).

Listing 12.05(A) requires "[m]ental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing)." 20 C.F.R. § 404 subpt. P, app. 1, listing 12.05(A). Substantial evidence supports the ALJ's conclusion that the Claimant had no problems of the sort. R. at 19. In fact, as noted above, when the Claimant was young she helped her mother with housework, cooking, and babysitting. R. at 124. After she had her first child in 1968, she was a homemaker. R. at 39, 832. Not only did the Claimant not have any problems with toileting, eating, dressing, or bathing, the evidence shows she helped a number of children with these basic daily tasks.

Although she cannot meet the other three sub-listings under listing 12.05, the Claimant does meet listing 12.05(C). In addition to an I.Q. between sixty and seventy, listing 12.05(C) requires "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. § 404 subpt. P, app. 1, listing 12.05(C). If a claimant has another impairment that qualifies as "severe," then that impairment should also be

considered a significant work-related limitation under listing 12.05(C). Luckey, 890 F.2d at 669. Severe impairments are those "which significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c). The Fourth Circuit has noted that the severity hurdle is a fairly easy one to clear. Albright v. Comm'r of Soc. Sec., 174 F.3d 473, 474 n.1 (4th Cir. 1999). The ALJ determined that, in addition to her borderline intellectual functioning, the Claimant had hydrocephalus which qualified as "severe" under 20 C.F.R. §404.1520(c). R. at 17. The Claimant therefore meets the strictures of listing 12.05(C).

IV. Substantial Evidence Supports the ALJ's Finding as to Residual Functional Capacity

Although he concluded that the Claimant did not have an impairment or combination of impairments that met or equaled the listings, the ALJ did not end his analysis there. R. at 19-24. The ALJ went on to find that prior to the Claimant's twenty-second birthday she had the residual functional capacity to perform sedentary work, limited to simple, unskilled jobs. R. at 19. The Code of Federal Regulations defines sedentary work as that which involves lifting no more than ten pounds and involves mostly sitting, with occasional standing or walking. 20 C.F.R. §404.1567(a). "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §404.1568(a).

Substantial evidence supports the ALJ's determination with regard to the Claimant's residual functional capacity. In a November 2008 letter, Dr. Thompson noted that when he treated the Claimant back in the 1970s "she was clumsy." R. at 801. In addition, both the Claimant and her sister testified that when the Claimant was young she would, at times, fall for no apparent reason. R. at 40, 42. As discussed above in Section I, however, these are the only two pieces of evidence that support a finding that the Claimant suffered from unsteady gait in the period before she turned twenty-two. Most of the evidence in the record supports the ALJ's

finding that, during the time up to and including 1972, the Claimant retained the residual functional capacity to perform sedentary work, limited to simple, unskilled jobs. See, e.g., R. at 127 (Claimant used to go dancing), 353 (unsteady gait began in the 1980s), 667 (husband reporting that unsteady gait began in 1977), 668 (5/5 motor functioning in all groups and normal tandem gait). Even if the ALJ had accepted the weaker evidence that the Claimant was unsteady in her gait prior to 1972, the record is completely devoid of any indication that the Claimant was unable to stand or walk occasionally during that period. See 20 C.F.R. §404.1567(a) (defining sedentary work). Although the Claimant had problems with borderline mental functioning and depression before her twenty-second birthday, she admitted that this did not stop her from helping her mother with housework and being a homemaker herself once she got married. R. at 39, 124. See also Cooper v. Astrue, No. Civil 3:08-84, 2009 WL 3248096, at *1 (S.D.W.Va. Sept. 30, 2009) (finding that substantial evidence supported the ALJ's determination that a claimant who used to work in food preparation and served as a homemaker had the residual functional capacity for a limited range of light work); Shelton v. Astrue, No. 3-07-cv-1347, 2008 WL 4809436, at *4 (N.D.Tex. Nov. 3, 2008) (claimant's residual functional capacity was not less than sedentary where her daily activities included babysitting and performing light housework).

V. Substantial Evidence Supports the ALJ's Conclusion that the Claimant Was Not Disabled

Since the Claimant does not have any past relevant work during the time period in question, the ALJ continued to the fifth and final step of the disability determination. Adkins v. Astrue, No. 3:10-cv-60, 2011 WL 652508, at *1 (E.D.Va. Feb. 10, 2011). The final step requires the ALJ to determine whether the Claimant could adjust to other work given her residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). To do

this, the ALJ used an impartial vocational expert. R. at 25. That vocational expert testified that the Claimant could perform such jobs as production worker or material handler, with 1,500 positions available for the former and 950 positions available for the latter in Virginia. Id. See also Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (110 jobs in the regional economy does not constitute an insignificant number). The vocational expert's testimony provided substantial evidence for the ALJ's conclusion that there are jobs that exist in significant numbers in the economy that the Claimant could have performed. Morgan v. Barnhart, 142 Fed.Appx. 716, 720 (4th Cir. 2005) (the ALJ is generally obligated to accept evidence from the vocational expert regarding whether there are jobs for the claimant in the economy); Spaulding v. Chater, No. 94-1732, 1995 WL 646358, at *2 (4th Cir. 1995) (vocational expert's testimony provided substantial evidence that jobs existed in the national economy that the claimant could perform); R. at 24-25. There has been no allegation in this case that the ALJ posed a faulty question to the vocational expert. Morgan, 142 Fed.Appx. at 721 (vocational expert's testimony does not provide substantial evidence where the ALJ poses a faulty hypothetical question to that vocational expert). Since there are significant numbers of jobs in the economy to which someone with the same characteristics as this Claimant prior to age twenty-two could adjust, the ALJ correctly concluded that the Claimant was not disabled during that period. 20 C.F.R. § 404.1520(g)(1).

## VI. The Court Declines to Remand for Consideration of New Evidence

Along with the Motion for Summary Judgment that she submitted to the Magistrate Judge, the Claimant included eight pages of attachments, three of which are not part of the administrative record. Attachs. to Claimant's Mot. for Summ. J. 1, 7-8, Nov. 19, 2010, ECF No. 14-1. The first piece of new evidence is a November 2009 letter from Dr. Elliott concerning the

Claimant's substandard housing and how that situation is affecting her current blood pressure and anxiety issues. Id. at 1. Dr. Elliott's letter does not warrant a remand because it is not relevant to the determination of disability for the time period in question. See Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985) (to warrant remand, new evidence must be relevant, among other considerations), superseded by statute on another point of law, 42 U.S.C. § 405(g). The second letter, which is from Legal Aid and is dated March 15th, 2010, is simply not relevant to a determination of disability for any time period. Id.; Attachs. to Claimant's Mot. for Summ. J. 7. The Legal Aid letter merely summarizes a meeting the Claimant had with an attorney from that organization and sets out the ALJ's findings. Attachs. to Claimant's Mot. for Summ. J. 7. There is no need for the ALJ to review a lawyer's summary of the decision that the ALJ himself wrote. The third and final piece of new evidence is an August 2010 letter from Dr. Hurt, which reiterates the points he made in a number of other letters already in the record. Compare Id. at 8 with R. at 170, 174, 262, 273, 794, 800. Although relevant, Dr. Hurt's latest letter is cumulative, which precludes it from triggering a remand in this case. Wilkins v. Sec'y, Dept. of Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991) (evidence is not new if it is duplicative or cumulative).

## **CONCLUSION**

For the reasons explained above, the Court finds that substantial evidence supports the ALJ's ultimate conclusion that the Claimant is not disabled. The Court therefore **OVERRULES** the Claimant's Objection, **ADOPTS** the Magistrate Judge's Report and Recommendation, **GRANTS** the Commissioner's Motion for Summary Judgment, **AFFIRMS** the Commissioner's final decision, and **DISMISSES** this case from the docket.

ENTERED this 11th day of May, 2011.

s/Jackson L. Kiser
Senior United States District Judge